The next matter, number 24-1011, United States v. Thiago de Souza Prado. At this time, would counsel for the appellant please introduce himself on the record to begin. Good morning. My name is James Mason. I am here on behalf of the appellant, Thiago de Souza Prado. I'd like to reserve two minutes for rebuttal, please. Yes. We're prepared to stand on the brief when it comes to the arguments of the amending the indictment during trial and the recusing of the U.S. Attorney's Office of Massachusetts, unless, of course, the court has questions. I'd be happy to take those. So what I'm hoping to focus on is the sentencing issues that were at play here. And there's kind of two main focuses here. One is that was the loss calculations, were those done correctly? And then the second big argument is going to be, was it a reasonable sentence given the nature of the sentence received by the co-defendants and other people who are in similar situated cases? So I'll focus with the loss issue first. Let's jump right into that. So let's assume that I agree that Gonzalez-Alvarez is dissimilar from your case, as you argue. How do you explain how the ride share companies suffered no loss? So in essence, you have companies that had rides that were done under their auspices. Riders got rides. The companies made money from those rides. And so the purpose of what the company is doing, creating this ride share system, functioned as it was intended to. Yes, there were things that were not done based on the company policies or things that were not done based on the regulatory issues that take place because Massachusetts is trying to supervise these. But that sort of thing is not a pecuniary loss. Because the rides were given, because the fares were taken, because the companies took the profits, they didn't really suffer any notable loss. Certainly not the loss that would put him up 12 points in that category when we're sort of calculating that. The reason why I think, you know, you said in your hypothetical you agree with me, is that the unadulterated milk case, so the Gonzalez-Alvarez case, that product was deemed to be a complete loss because this was adulterated milk. Nobody wants to drink adulterated milk. But isn't Judge Wolf's point nobody wants these rides because the risk is substantial and you are taking the ride based on some understanding from the ride share's advertising and maybe imputed knowledge of what Massachusetts requires, that this ride has certain elements of safety that are nonexistent and therefore this ride is like the milk. It's not what you wanted and there are real reasons you wouldn't want it. Yeah, and I think if I remember back to that hearing that he had with all the defendants, his analogy was I think, well, my wife wouldn't want to ride with somebody who was a convicted sex offender. And I think the rebuttal then is sort of my rebuttal now is that we don't have any evidence that that happened. We don't have any evidence, one, that people were put in. But is that really, is it the fact that there was or wasn't a sex offender driving? It's the fact that I as the rider have some understanding or belief that something has been done to make sure that's not the situation and if I knew that there was nothing done here, I wouldn't want that product. Isn't that really what he's saying? It's not the fact. I agree, terrible things didn't happen. But it's the risk of the terrible thing that he's saying makes it valueless. Yeah, but when we get to sort of like the regulations are at issue, I think is when we're looking at, they're talking about like professional services, is that what the regulations are there for is to regulate the companies themselves. And I think you do have to go and look at to what actually happened is that the rides did actually happen. The rides actually did happen in safety. And while there may be this idea that the rideshare companies, people might not have taken these rides, but for, like you said, that they're saying it's safety. It's interesting when you put it in the context of these rideshare companies happening, they evolved out of sort of an alternative to taxis. A very regulated, very controlled system that it's this alternative that these people embrace. You can embrace them for lots of reasons, whether it's the cleanliness, friendliness, the fact that you can have an app and you can kind of have an idea of where it is. Those are non-pecuniary issues. And I think the fact is people are getting into these rides because of these non-pecuniary issues, which means we can't say, well, they wouldn't have done it had they not known there was any sort of control regulation happening. I guess one difficulty I have is when I was reading your argument, it seems to me you're making a distinction between goods and services or that there might be a distinction. But what that leads me to think is perhaps here there was sort of a diminution in value of the rides. It was like maybe it wasn't worth zero, but it was worth half of what it costs or whatever. But you don't make that argument, and I can't find any sort of distinction like that in the case law. And so I guess I'm just wondering at the jump you make to zero, I think I'm not seeing it. I think I essentially have to make using zero as a substitute for an undetermined loss. Because if you're right, let's say the ride is a dollar. The value of it is a dollar, and nobody's going to get a ride for a dollar. But is it a cent? Is it 99 cents? It's like there's not a clear way of determining where that monetary value is. And this particular section of the sentencing guidelines is based on trying to determine where in the funerary value does it lie. And so if we can't really determine it, it's not that it's quite no loss, but the lowest category is $6,500 or less. I don't know how to call them, the bot rides or the… Yes. Are we excluding that? The drone is the term. The drone, yes. Does that figure into the decision we need to make here, or are those excluded? I don't think that there was evidence put on that the drone, this computer app was used. But I don't believe there was any evidence in the record to say there is such X number of rides, meaning X number of values that can be attributed to the drone. It was just the idea of it was discussed. What do you say to the argument that this is harmless? Judge Wolf said, I understand maybe there's no loss, but that just means that the guidelines don't get to the core of this, which is the non-safety of the rides. And that's a serious thing to put people at risk. And so I would do the same thing whether the guideline drives it or not. And as I understand our case, you would have to, for that to be wrong, we would have to believe there's some reason he would have or I would have had to have done something different. And why is his thinking about that of an upward variance based on just the safety risk wrong? I think it's very clear that you're right. He said on multiple occasions, if there is no value, then I don't believe this captures the seriousness of the crime. That doesn't mean he said I would sentence him exactly the same. I think he says I would have used the amount that I'm finding as loss as capturing the right place to think about this case. So I think the way I read that is with a little bit more ambiguity than that. I think, do I believe that he would sentence in the guideline range of where this would be? I think that doesn't seem to be the case. But I don't think we know where it would be. And I think, unless he says very specifically, this number is exactly what I would do. In the cases cited by the government in their brief that I think I mentioned in my reply, you go into each one of those, you will find that sort of language. So he would need, under your thinking, he would need to say, regardless of the guideline range, I would sentence 70 months. Or something to the effect, if there was one case that they were talking about two different interpretations of it, and the defense is I'm sure arguing for the lower one, the government was arguing for the higher one, and the judge there said, well, either way, even if I agree with you, I think the higher number, where I would end up, that's where I would end up. And so you don't have to say specifically 70, but pretty much he needs to say, this is the range of where I would be. And I just don't think we have that specific sort of language. Are you saying here that there is no loss at all, or else that the loss is certainly not 450 and it's too hard to determine, so we shouldn't put a number on it? I would, I think the argument was that there was no loss at all, certainly at the trial level. I think that's harder to make here upon appeal. But I don't think we know enough to know that it wouldn't fall, to say that it would fall above that 6,500. And so in essence, I think there is really no calculable loss at all. If there is an indeterminate loss, then don't the guidelines provide that we can use gain as the measure? They do, they do, but I think that would have to be, I think we would have to get a little bit more information to do that. But I think that really has to be done by the trial judge. I think because he was very, this was a very litigated issue across all the defendants. And so I think we would have to send that back to him and say you can use gain. But I just feel as if there's no, there's just not enough information to suggest that gain is the proper thing either. Again, because the rides were made, the companies made the profits, and they didn't return any of the profits from these rides, which they might have been asked to do had it been worthless. Maybe there's no evidence of gain, but it seems still like, it's still a fraud. You're not saying this count should have been, this case should have been dismissed. So I thought the idea was when you can't or there is no loss, you just use gain because that stands in the place of loss. It's not a, isn't that the reason we do that? I would agree that there's, it is an option the court, the sentencing court would have. He just didn't do that is your point? I think that's right. In the brief time that I have left, I do want to address the idea of a trial penalty. And I know the court said very specifically not being sentenced for, he's not being sentenced for going to trial. That's not a decision that was made. But when you look at the sentence, when you look at the effect, he got a 65% higher sentence, almost 65% than anybody else in the case. One of the cases that I cite to you in a study that's involved with that says there is a 64% trial penalty. So how do you disaggregate? There's two things going on. One, you can call it a trial penalty. But the other thing is, wow, I sat here for a week and I listened and I understand. And now I've read many PSRs. They have a certain level of detail. I've also been in many trials. There's a lot more detail. How do you disaggregate trial penalty from I have a much fuller understanding of this crime and its seriousness? I think whenever I've thought about sentencing in a data perspective, you really need to get to a large set. Because any one little thing, you can get lost in sort of the noise of a particular case. But the study they cited, I believe it was 200,000 cases that they looked at. And to see that you have a very similar number, higher sentence, 64%. It was actually, his sentence was almost 65%. It was like 64.3. And to be right there, to be right at the same thing as this study reveals, means yes, you might have gotten more information, but so did, what about all the other cases where the judges got the exact same information that they would have gotten in the PSR? Because sometimes that is what happens. If I were to write that opinion, how would I explain, well, this isn't one where it's based on more information, it's just a trial penalty? Because you agree there was more information. So, I mean, how does one explain when what you're saying is forbidden versus what I think we all agree is accepted? There's something new. This guy I learned was deep into the dark web, I think, is one of the facts here. How would you write it to say, well, it's that bad way and not this way that's acceptable? If I may respond.  I think you are tasked with the responsibility to let the sentencing courts and the circuit know that they need to be aware that the inclination, I don't believe there's intended to punish because they went to trial, but I think even if you learn, you need to say, even if you do learn more information, that you need to be aware that as a whole judges are more likely to increase the penalty whether it is intentional or not. And if we take the judge at his word, which I see no reason not to, he was very aware of the problem, right, and articulated, I'm not punishing you for the trial, I'm more concerned because of what I learned about you. Yeah, he said it, and yet the sentence that my client received was exactly the same percentage that studies show people who go to trial receive longer sentences on. Thank you. Thank you. Thank you, counsel. At this time, on counsel for the government, please introduce yourself on the record to begin. May it please the court, Lauren Zurier for the government. I want to work backwards. I want to briefly touch on harmless error and then consider the loss issue and end with a brief mention of the disparity and trial penalty question. Regarding harmless error, the record is extremely clear. If you look, for example, at joint appendix page 251, the judge says, if there was no loss, I would depart upward to the level that the loss, the actual loss as I calculate it, would get to as the starting point or the guideline range that I'm calculating. At the government supplemental appendix at 23 and 24, there's a similar statement saying, if I departed, I would use the payments made to the defendants by the companies to determine the reasonable range for the departure, which would result in essentially using the same guideline range as if there had been no loss, I would attribute no value to the services provided. So either way, either path you take, you come to the same end point, that this was a fair and correctly calculated GSR. As to calculation of loss, Gonzalez-Alvarez has a broader statement than what opposing counsel has made it out to be. It says that where the service or product misrepresented by the defendant is worthless, loss is calculated by using the entire price paid for the product. So the two questions arise. One is, when is the product worthless? And two, what was that entire price paid? Gonzalez-Alvarez teaches that when the product cannot be lawfully sold, it has a value of zero. And these rides and the drivers who gave the rides were indisputably illegally giving them. The rides themselves were illegal. And why do the guidelines differentiate between services and goods? I'm not speaking about that application note 3FV, Your Honor. I'm actually speaking about the holding and discussion in Gonzalez-Alvarez and Iannaccio too, which although it cites to that application note three in a footnote, actually specifically says it's not using it. So I don't think there's a logical reason to distinguish between services and products for this purpose. Excuse me. Are those goods cases? I'm sorry? Are those cases involving goods as the product? Those cases are both involving goods, but Iannaccio did not. It's then consistent with the application note. The application note didn't exist when Gonzalez-Alvarez was decided, but, yes, it would be consistent. That same note doesn't apply the same rule to services. It doesn't apply to services, although there are courts that wonder why, because it's hard to draw a logical distinction between a worthless illegal service and a worthless illegal product. But at any rate. How does that work, though? So in a guideline, we have a guideline that says calculate loss, and you have a commentary that picks out specific problems. I mean, this is, I think, what Judge Wolf said. So that guideline, that commentary note identifies a problem around goods, but he generalizes out of that some thoughts about worthless value, not following regulations, various things. And he says, well, those thoughts animate my thinking about this. What do we do? But the guideline commentary note doesn't cover that. Is that an appropriate way for the judge to go about it? To say the guideline commentary doesn't cover this, but I can sort of generalize the thoughts from it to reach my loss calculation? Well, neither the guidelines, the guidelines themselves aren't binding. The principles make sense, because if you say that the calculation of loss demonstrates the severity of the crime, and I would refer the court to the PSR paragraphs 47 to 52, which outline all the different kinds of loss that were involved, not all of which were financially quantifiable because the government didn't have the evidence. But it's explained there. How else do you demonstrate the severity of the crime? And that's why there's application note 21. So if what you want to, if the correct thinking is, well, we can't directly apply the loss guideline because our application note doesn't specifically allow us to, then the analysis would be we can analogize to the loss guideline because the logic is the same, and then use application note 21 to get to where we want to be, because it would make no sense to say that $400,000 of payments for a product makes a defendant more, deserve a longer sentence than $400,000 of an illicit service. Either way, it's money derived through a fraudulent scheme. Just in common sense terms, how do you say these rides were worthless? They were timely? They got the person to their destination that they wanted to go to? Well, we really don't know. There's no evidence either way. I would rely on the fact that the estimate of loss has to be reasonable. It doesn't have to be exact. And as this court said in Ayanacho, when you have a situation where it's not clear who the victims, who the victims, the riders were, they were not identified, or which, how they would have felt, whether some of them would have placed a higher subjective value on a ride because they got from point A to point B, regardless of whether the driver was complying with state law. When you can't calculate that, when you don't have the evidence to support that, it's fair to use the value of the service as the amount of the loss. But it seems like you're valuing risk not at the time that it's undertaken, but after the fact. And I'm not sure that makes sense. I mean, if I buy a one-year term insurance policy and don't tell the insurer I lie about my medical history so the insurer has taken on a risk that they did not want to take on, but I survived that year and they keep their money, it doesn't seem to me the insurance company has been harmed at all, which would be the same sort of analysis that would apply to these rides. I disagree with that, Your Honor, because I think what this court has said, and it's certainly in Ayanacho, is that the loss calculation, you use the entire value and declare it worthless to stress the importance and further the importance of the state safety regulations. Once you start slicing and dicing which product was safe after the fact and which wasn't, you undercut the import of the very regulations that were supposed to prevent the conduct in the first place. So you would say that insurance company, in my example, suffered a loss? I would say that if there was a state regulation, I would say that the loss is the measure of the harm and the seriousness of the fraudulent scheme. I don't know if it's quite fair to say that the physical amount of money lost is exactly what the guidelines talk about. The guidelines tie loss to the severity of the crime, because it's really very difficult to otherwise find a concrete way to measure the severity of the crime. And Application No. 21 exists because the guidelines recognize that sometimes it won't work exactly. But I think this judge was in the ballpark. He saw that this was a very severe crime. The trial evidence made it out much more severely than the PSR itself. And he wanted to find a way to reflect that harm. And a $400,000 loss, which is pretty conservative given the things that weren't quantified, was the fairest way to do that. I don't know what the government says in the PSR. The USPO agreed that the losses were underreported. We didn't have the evidence to trace every single loss. It's likely there were more victims. It's likely there were more payments. We just don't know. So this is actually a very fair and conservative measure of the harm done. And if the Court has no more questions on that, I'd like to briefly address the disparity issue. There was no trial penalty, as you have already noted. The judge made it clear over and over again he was not penalizing the defendant for going to trial. The severity, he wasn't penalized. He was penalized, or he was sentenced more severely because of all the information that came out during the trial. And the judge says that. He said, I didn't have as much information about these other defendants as I have about you. And had I had more information about the other defendants, their sentences might have been higher. There's no basis, given all the information about this defendant, and given that he was charged with more offenses than his co-defendants, and given that he went to trial, there's no person standing in comparable shoes to compare him to. The sentence was the low end of the guideline range. You couldn't have gotten lower unless you went below the guideline range. And the judge kept saying, I think actually a sentence would be fairer if it were higher, but I'm not going to give you a higher sentence because I'm very aware of that disparity issue. And given that the disparity issue itself wasn't preserved, the sentence is substantively reasonable. And if the Court has no more questions, I ask that you deny the appeal and affirm the conviction and sentence. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has a two-minute rebuttal. Thank you. James Mason for the appellant. Judge Ganna, I want to go back to your insurance issue. I think the government did not want to say that there was a loss in that scenario, and I think the insurance company would agree that they got the value. So when they don't have to pay out on a claim, they actually, they're not really caring what would have been the underlying issue with the claim. They made the money, and the same is here. The reason why there's a good distinction between the services versus goods is because. But is the focus the rideshare company or is it the rider? I mean, the rider paid money. I mean, Judge Wolf says it was something they didn't get. And so you're saying they did get it. And then it comes down to, well, what's the it? And Judge Wolf would say the it is a ride that has the indicia of safety so that when you got into that car, you had the peace of mind to know this was going to be a safe ride. And so you, the rider, lost out and you lost that peace of mind, basically. My response to that is they didn't. The riders did have the peace of mind. The riders did get to where they wanted to go. The riders did pay the fee that they agreed to pay. In fact, the entire service being rendered was, in fact, given. I think that's kind of why I think some of your questions to the government were this distinction between services and goods. So does the record that's not with the appendix, does the rest of the record enclose the cumulative tips that were paid by the riders? That's a great question. I don't know. I don't know if the record does have that. There were a number of records that were put in in the government supplemental appendix. I don't have an answer to that question. But I don't remember reading the trial transcript that there was a big distinction between the tips. And let me just finish that. I don't remember there being a discussion about the difference. I think they talked about tips, but setting those out is part of the testimony. And if there's reasons, we would ask you to send this back to the trial court. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.